## CIRCUIT COURT OF THE CITY OF RICHMOND

Rubbermaid Applied Products, Inc.

v.

City of Richmond and
Harold R. Wall, Director,
Department of General Services

November 17, 1982

Case No. G 8270-2

BY JUDGE MARVIN F. COLE

On September 16, 1982, the plaintiff, Rubbermaid Applied Products, Inc., filed its First Amended Bill of Complaint, alleging essentially three things: (1) that Rubbermaid was the lowest responsible bidder on the refuse container carts because Zarn failed to meet, and specifically excepted to, Specification 3.2; (2) that Rubbermaid was the lowest responsible bidder because when requested to submit a sample for testing, Zarn improperly submitted a "prototype" sample and did not timely submit a production sample as requested; (3) that Rubbermaid was the lowest responsible bidder because Zarn violated the Department of General Services "no contact" policy precluding contact between bidders and the Department in the interim between the bid opening and the bid award. By virtue of these three violations, Rubbermaid asked the court to enjoin the City of Richmond from awarding the contract to Zarn and to award the contract to Rubbermaid as the lowest responsible bidder. Or in the alternative, Rubbermaid asks that the City be required to resolicit the bid for the refuse container carts. At the trial, counsel abandoned the first request and asked the court to consider only the resolicitation of the bids.

The court shall consider each of the above three points in the order stated.

**(1)** *Zarn failed to meet and specifically excepted to Specification 3.2*

Paragraph 3.2 in the specifications in the Request for Bids sets forth the following:

> Metal Hardware: All metal parts, interior and exterior, are to be stainless steel or to be protected against corrosion through the use of paint, zinc plating, or other appropriate coating with a minimum thickness of not less than 0.001 inch.

Zarn, in its bid submitted to the Department of General Services on June 1, 1982, stated the following:

> The following minor exceptions to your specifications should be noted:
> 1. Not applicable.
> 2. Not applicable.
> 3. Item 3.2 — The minimum thickness of coatings specified at 0.001 inch can be supplied on all hardware except small items such as nuts and bolts. These items cannot be assembled if they are coated this heavily. Maximum allowable plating and coatings are included on these minor parts on the Zarn Roll-A-Waste carts.

We can therefore see from the Zarn bid that they have not complied with paragraph 3.2 of the specifications because Zarn admits that small items such as nuts and bolts could not be assembled by them having a minimum thickness of 0.001 inch. The testimony of Walter J. Sperko, a metallurgical engineer who tested the Zarn nuts and bolts, was to the effect that the Zarn nuts and bolts were coated with a zinc coating; that one of the primary purposes for using a zinc coating was that it has a uniform rate of corrosion in a given environmental situation and that this enables engineers to approximate the life expectancy of the zinc coating; that the life expectancy of the zinc coating is directly proportional to the thickness of the coating; that in his opinion the life expectancy of the zinc coating in the Richmond environment for the Zarn nuts and bolts would be approximately five years; that he performed A.S.T.M. standard tests to determine the thickness of the zinc coating on the Zarn nuts and bolts and that the values ranged from typically about 1.5 mils in coating thickness. One very large bolt had a coating of approximately nine-tenths of a mil. This testimony reflects that even the nuts and bolts of Zarn exceed the specification

of a thickness of 0.001 inch and that only one very large bolt had a coating of 0.0009 inch.

Under § 5-1.4 of the City Charter, the Department of General Services is required to make certain purchases, including the purchase involved in this action, by competitive bidding and to award the contract to the "lowest or best responsible bidder." Section 14-6 of the Code of the City of Richmond requires the Department to award such contracts to the "lowest responsible bidder" and set out certain criteria for determining the "lowest responsible bidder."

The Supreme Court of Virginia has discussed similar language in the case of *Taylor v. Arlington County Board*, 189 Va. 472, and in that case the court cited with approval the following statements, which are applicable to this case:

> It is next urged by the appellants that the County Board had no right to evaluate the bids, first, because no notice of such action was given, and second, the method used was unwarranted. We think neither of these contentions is sound.

In the case at bar, the request for bids stated that the purchase would be made only "if and when ordered." The City did not agree to purchase anything. The request for bids also indicated that the bidder could be required to produce sample containers, and further stated that "as bids of this nature require more time for evaluation than do the average, if the figure inserted here is less than 45, bid may not be considered." Therefore, it is seen that the bidders had to have known that the City would carefully evaluate each bid.

> The "lowest" bid may be determined by monetary standards with the dollars as the unit, but this is not so in determining the "best" bid, or the "responsible" bid; that question involves a number of other factors and elements . A decision as to the lowest and best bidder for a supply contract involves a determination of the least expenditure of public funds and a consideration of the quality of the goods proposed to be furnished and the other factors and elements adverted to above.
>
> Clearly, among the factors so involved are the experience of the bidder in that field, the quality of his previous work and the cost, not alone of constructing what he proposes to build, but of operating it after it is built. All else being equal, it is the duty of

the public authorities to accept the bid involving the least expenditure of public funds.

When the decision of the authorities is based upon a fair and honest exercise of their discretion, it will not be interfered with by the courts, even if erroneous. Courts do not in such cases substitute their judgment for the judgment of the body to which the decision is confided. Interference by the courts is limited to cases in which the public body has proceeded illegally or acted arbitrarily or fraudulently.

Generally, before a variation from the specifications will be deemed to destroy the competitive character of a bid for a public contract, the variation must be substantial, that is, it must affect the amount of the bid. It is sufficient if the bid conforms substantially to the advertisement.

It is my opinion in this case that the Zarn bid does conform substantially to the specifications of the bid request. It should be remembered that we are not concerned here with any piece of equipment that is highly technical and complicated. It is only a plastic container with a lid upon it and with some metal components for holding it together and to provide for dumping. The allegation of the plaintiff is that the nuts and bolts used by Zarn do not meet the specifications because the coating to prevent corrosion is not 0.001 inch. As previously shown in this letter, the deviation is minimal at best, and the tests performed by the plaintiff show many of the nuts and bolts tested do meet the specifications. The evidence supports the fact that the life expectancy of the zinc coating used by Zarn is five years or better, and the warranty only covers a period of five years.

Furthermore, the cost of the coating on the nuts and bolts is minimal. The evidence is to the effect that it costs Rubbermaid $.298 per unit over and above its standard unit to meet the specification. (Pl. Ex. 34.) There are 77,000 units involved, so the total cost involved is $22,946.00. The plaintiff further contends that this is direct cost and does not involve overhead costs. The Rubbermaid bid was for $32.07 per unit. Therefore, the percentage of the increased cost of $.298 to the total cost is .93 percent of one percent of the cost, or a total cost in dollars of $22,969. It is my opinion that this amount is minimal and not substantial. The difference between the Rubbermaid bid and the Zarn bid was approximately $114,000.00. Therefore, the increase in the cost of the coating of the nuts and bolts would have made no difference in the final bid price. If you deducted $.298 from the Rubbermaid bid per unit, Zarn would still have

the lowest bid per unit. And the difference in the bids would still be substantial. Therefore, I am of the opinion that any variation from the specifications in this case has not been substantial and has not destroyed the competitive character of the bid process.

The Senior Purchasing Officer for the Bureau of Purchases and Stores, Linwood J. Spindle, who handled the bid process in this matter, testified that it was his opinion that any deviation from the specifications in this case was not substantial, and his position was further supported by that of the Review Board which was convened in this matter. This is a matter which was within their discretion, and the court will not disturb their judgment in making this decision.

(2) *When requested to submit a sample, Zarn improperly submitted a "prototype" sample and did not timely submit a "production" sample.*

The Bid Request contained the following provision:

> Bidder is to have ready available sample container and dump
> unit for testing purposes if and when requested by the City.

The purchasing officer by letter dated June 4, 1982 (Pl. Ex. 8) wrote to the bidders stating that "the City hereby requests a true sample of all types of proposed refuse carts offered to the City of Richmond to be submitted by June 17, 1982."

Much has been made by counsel in this case as to whether the samples submitted by Zarn were "prototype" samples or "production" and what is a "true" sample as requested by Spindle.

First, Spindle put the date of June 17, 1982, in the letter as a deadline for his benefit. He wanted to get all of the samples by an established date so that he could have them comparatively tested. There is no reason that he could not extend this date since it was solely for his own benefit.

The purpose of submitting samples was not to create a technical blockade in the path of bidders but, as stated in the Bid Request, was for testing purposes. The sample, by whatever name you call it, that Spindle wanted was one that complied substantially with the specifications and that could be used for testing purposes. Two laboratories in this case tested the containers. Neither has complained that the samples submitted to it were not suitable for testing purposes. Spindle testified that Zarn submitted samples satisfactory for his purposes on or before June 17, 1982, as requested. There is no evidence that what was submitted was not satisfactory for

testing purposes. Therefore, there is no merit to this, the second complaint of the plaintiff.

**(3)** *Zarn violated the Department of General Services "No contact" policy precluding contact between bidders.*

The Chief of Purchases and Stores, a bureau in the Department of General Services, on June 12, 1981, issued a bulletin addressed to all purchasing officers setting forth the procedure for Bid Results Disclosure. The pertinent portion of the bulletin (Pl. Ex. 13) is as follows:

> Bid prices are public information. However, this is true only at certain stages of the bid process. The hour and date of bid openings are indicated on all formal Invitations for Bid. When this day and hour arrive, the Purchasing Officer removes all bids from the locked bid box, opens them in the presence of all attending bidders or interested persons, reads aloud the prices quoted, and records these bids on a tabulation sheet. *The Purchasing Officer does not discuss the bids with those present.* He opens and reads them with no comment.

After the public opening, the Purchasing Officer reviews all bids and accompanying documents to assure himself/herself that all bids are filled out, executed, and submitted in accordance with the instructions contained in the Invitation for Bid. During this analysis phase, the Purchasing Officer is identifying the lowest, responsible bidder using the following factors, among others, to protect and preserve the interests of the City.

a. The ability, capacity, and skill of the bidder to perform the services required;

b. Whether the bidder can perform the services promptly, within the time specified, without delay or interferences;

c. The character, integrity, reputation, judgment, experience, and efficiency of the bidder;

d. The sufficiency of the financial resource; and

e. The amount and conditions, if any, of the bid.

Whenever the character, quality or suitability of any product or service being purchased are subject to possible differences of opinion, bids received may also be submitted to the concerned operating agencies for review and comments.

*From the period of the public bid opening until the review analysis process by the Purchasing Officer and operating agencies are completed*

*and the award is made, no additional information is given to or solicited from the suppliers, bidders, or the public by the Purchasing Officer or any City agency or employee. Bid evaluation must be made on the contents of the sealed bid only.* This procedure accomplishes the following:

a. Resolves non-concurrence prior to contract award;

b. Eliminates possible pressure on the Purchasing Officer;

c. Reduces the possibility of erroneously notifying the wrong bidder which may expose the City to liability;

d. Fosters better relations with contractors doing business with the City of Richmond; and

e. Assures that the award is made on the most economically sound basis, thus using tax dollars to the best advantage.

After the award is announced, only then will the *file* again become public information.

In the record, counsel and perhaps the court has referred to this policy as a "no contact policy." The City officials also spoke of the policy in these terms. However, the bulletin does not say that there shall be no contact between the City and bidders under any circumstances. For example, it was certainly appropriate for Spindle to request submission of the samples, and it was appropriate for the bidders to respond. And certainly it would be appropriate for the parties to clarify any problem that might arise over submission of the samples.

The bulletin states that the *"Bid evaluation must be made on the contents of the sealed bid only."* We know that this is not literally true. It is generally true as between the City and the bidders, but we know from the bulletin itself that the City can seek information from any other source that it desires. The bulletin refers to an analysis phase, and in identifying the lowest responsible bidder, the purchasing officer must consider the ability, capacity, and skill of the bidder to perform the services; the character, integrity, reputation, judgment, experience, and efficiency of the bidder; and other factors listed in the bulletin. Of necessity, these things do not come from the sealed bid. The Purchasing Officer must use his own good judgment concerning the means and methods that are necessary for him to make these evaluations. The bulletin does not preclude him from making such determinations. The bulletin does state that as between the City and the bidders, no additional information is given to or solicited from the suppliers, bidders, or the public by the Purchasing Officer or any City agency or employee. This is referred to as the "no contact" policy, but

such must be applied with reason and with a knowledge as to the purpose of the policy as set forth in the bulletin.

In my opinion, the record discloses a number of violations of the provisions of this bulletin on the part of Zarn. I will mention a few of them as gleaned from the memorandum of counsel and from the evidence in the case, and I am confident that a number of violations, particularly telephone conversations, are omitted from the following.

1. On June 3, 1982, Thomas E. Douglas, vice president of marketing for Zarn, wrote a letter to Spindle of the Department of General Services and discussed and promoted in that letter Zarn's products. This letter was also derogatory of at least one other bidder in the matter.

2. On June 3, 1982, there was also a telephone call from Douglas to Spindle (see Niegelsky deposition, Pl. Ex. 12). It is specifically noted that in this telephone call, Spindle stated to Douglas there would be no meetings until the award was made, that there would be no presentations, and he stated there would be an even comparison and that they must consider all bidders. Spindle also advised Douglas there would be no preference to any one bidder and that he would go by the rules.

3. Despite the above admonition on the part of Spindle to Douglas, on June 14, 1982, Douglas wrote a letter to Grayson M. Palmore, Chief of the Division of Refuse Collection and Disposal for the City of Richmond (see Niegelsky deposition, Pl. Ex. 18), in order to forward promotional literature and tests data for Mr. Palmore's evaluation.

4. On or about June 28, 1982, a representative of Zarn contacted Mr. Palmore to inquire about laboratory tests and to arrange a meeting with city officials. During this discussion, the representative of Zarn suggested that Mr. Palmore contact officials from Memphis, Tennessee, regarding their experience with Zarn and Rubbermaid Products.

5. There were several contacts made by Zarn officials with Commonwealth Laboratory, Inc., the independent laboratory that was testing the products for the City of Richmond. I will not attempt to elaborate on these contacts, but Commonwealth Laboratory was acting as an agent for the City of Richmond in the testing process and should not have been contacted by Zarn.

6. On July 9, 1982, Mr. Clayton J. Ammondson, President of Zarn, wrote Linwood J. Spindle of the Department of General Services a letter complaining of the limited testing being done by Commonwealth Laboratory. In his letter, Mr. Ammondson referred to a prior conversation with City officials concerning further tests on both dump units and refuse con-

tainer carts. Mr. Ammondson suggested in this letter that the City employ several laboratories familiar to Zarn, or in the alternative, that the City refer and utilize Zarn's own testing manual. Mr. Ammondson also suggested that several representatives of the City of Richmond and Mr. Cox of Commonwealth Laboratory visit Memphis, Tennessee, a city that used Zarn refuse container carts. Mr. Ammondson offered to pay all expenses of such officials to inspect the Memphis program.

7. A representative of Zarn attempted to contact Mr. Cox of Commonwealth Laboratory at least twice on July 14, 1982, and left a message offering Mr. Cox use of Zarn testing equipment.

The purpose of a "no contact policy" is to preserve the integrity of the competitive bidding process and to protect the public from fraud and abuse of discretion by public officials. In the instant case, the Department has acquiesced to numerous communications by Zarn and has failed to address such communications. The record demonstrates that the Procurement Review Board convened by the Department in response to Rubbermaid's protest did not review the numerous letters sent by Zarn to various City officials and failed to address the numerous telephone conversations and personal visits by Zarn officials to the Department and to the City's testing laboratory.

However, Mr. Spindle has testified that he did not pay any attention to such communications and did not consider them in his evaluation of the products in this bidding process. The question in the case is whether this is the truth or not. A review of the Zarn business records indicates that they have written on several occasions in their notes that Spindle did in fact tell them that he did not want to be contacted and that he was to go by the rules and they were to make no presentations to him and they were not to contact him during the period of time in question. This adds substantial support to his testimony. I also observed Mr. Spindle very carefully as a witness in the case, and it is my opinion that he testified truthfully when he stated he ignored all of the letters and all of the communications which were addressed to him from Zarn in a very deliberate attempt to influence his judgment in the bidding process. However, I believe under the evidence in this case that they failed to do so and that Mr. Spindle did in fact in this case act within his discretion and was uninfluenced by any communications from Zarn.

The products in this case have been tested by two testing laboratories, and I am of the opinion that the quality of the products is approximately equal and that it would have been within Mr. Spindle's discretion to have

chosen either one of them. However, Zarn was the lowest bidder by a substantial amount, and the evidence in this case indicates that was the decisive factor. Two independent laboratories tested the products in this case, and, generally speaking, the reports from both laboratories indicate that the products of these two companies would both perform satisfactorily for the City of Richmond for the purpose for which they were desired. It is therefore my opinion that the bids have been fairly evaluated by the Department of General Services and that there has been no fraud or abuse of discretion on behalf of the City officials. It is my opinion that the bidding process in this case has been regular and fair and that the integrity of the competitive bidding process has been preserved and that it is in the best interest of the public in this case to award the contract to the lowest responsible bidder. There has been no attempt in this case to show that Zarn is not responsible. There has been no attempt in this case to show that they do not have a satisfactory product, except as to the nuts and bolts which have previously been discussed in this memorandum. I am therefore of the opinion that the City has acted within its discretionary powers in this matter, and this court should not attempt to substitute its judgment for that of the appropriate City officials.